UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

_____
                                        )
ROBIN MORRIS,                           )
                                        )
                    Plaintiff           )
                                        )
            v.                          )
                                        )
B&F MACHINE, CO., INC.                  )
                                        )
                                        )
                    Defendant.          )
_____)

## COMPLAINT AND JURY DEMAND

## PARTIES

1.     The Plaintiff, Robin Morris ("Ms. Morris" or "Plaintiff"), is a female resident of Connecticut residing at 102 Colonial Court, Plainville, Connecticut 06062. Plainville is in Hartford County.

2.     Defendant B&F Machine, Co., Inc. ("B&F" or the "Company") is incorporated under Connecticut law. B&F's principal office is located at 370 John Downey Drive, New Britain, Connecticut 06051.  At all relevant times, B&F also operated a facility at the location of 145 Edgewood Avenue, New Britain, Connecticut, 06051. New Britain is in Hartford County.

## JURISDICTION AND VENUE

3.     This court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §1331 because Plaintiff has brought a claim pursuant to Title VII, 42 U.S.C. §2000e *et seq*., the Americans with Disabilities Act, 42 U.S.C. §§12101, *et seq*., and the Age Discrimination in

Employment Act ("ADEA"), 29 U.S.C. §623 *et seq.* This court may exercise supplemental jurisdiction over the Plaintiff's state law claims. 28 U.S.C. §1367.

4.     This court has personal jurisdiction over the Defendant because the Defendant is a resident of the State of Connecticut.  Further, the Defendant has engaged in and transacted business in the State of Connecticut, including by managing and/or operating a business in Connecticut and/or employing the Plaintiff in Connecticut, and Plaintiff's causes of action stem largely from business transactions within the State of Connecticut.  Indeed, the Plaintiff was employed by the Defendant in the State of Connecticut, was managed by the Defendant in the State of Connecticut, and was terminated by the Defendant in the State of Connecticut.

## **Statement of Facts**

5.     Ms. Morris is a 57-year-old woman.

6.     Starting on or around July 17, 2019, Ms. Morris began her employment with B&F as an Accounts Payable Specialist based in the Company's facility located at 145 Edgewood Avenue, New Britain, Connecticut, 06051.

7.     At all relevant times, Ms. Morris was a qualified employee, and her job performance was satisfactory.

8.     As the Accounts Payable Specialist, Ms. Morris sometimes had to deliver files and documents to different areas of the building, which meant that she had to walk past the factory area where the Assembly Department was located, as well as the Shipping and Receiving Departments, in addition to other areas.

9.     Sometime in or around August 2019, a male machine operator (the "Machine Operator," name unknown) began to stare at Ms. Morris in a sexually suggestive way when she walked past him and repeatedly told Ms. Morris in a sexually harassing manner that he liked

looking at her when she walked by him.  He told Ms. Morris that he thought she was beautiful.
He also repeatedly asked Ms. Morris for her phone number.

10.     Ms. Morris made it clear that she wanted the sexually charged staring and
comments to stop, but the Machine Operator's conduct continued and even escalated.  Indeed,
the ongoing conduct constituted sexual harassment.

11.     In or around September 2019, Ms. Morris raised protected concerns to the
Company's Finance Director (who was also the daughter of the owner of the Company) Carla
Francalangia ("Ms. Francalangia"), about the sexual harassment that she (Ms. Morris) was
experiencing.

12.     Ms. Francalangia brushed off Ms. Morris's concerns and dismissively declared
that the Machine Operator meant no harm.

13.     The Machine Operator continued to sexually harass Ms. Morris.

14.     In or around this time, another male employee in the Assembly Department (the
"Assembler," name unknown), began whistling at Ms. Morris in a sexually harassing manner
when Ms. Morris walked past him in the factory.

15.     Ms. Morris made it clear that she wanted the sexually harassing conduct to stop,
but it continued.

16.     In or around October 2019, the male Purchasing Supervisor, Robert Rioux ("Mr.
Rioux"), began to blow kisses at Ms. Morris in a sexually harassing manner and told Ms. Morris
that he wanted to cuddle with and kiss her (Ms. Morris).

17.     Ms. Morris made it clear that she did not consent to the sexually harassing
conduct and asked Mr. Rioux to stop, but the harassing conduct continued.

18.     Upon information and belief, Mr. Rioux is approximately 60 years old.

19.     In or around this time, Ms. Morris wore red pants to work. Mr. Rioux leered at Ms. Morris and, with a lewd smirk on his face, told her "I like those pants."  Indeed, through Mr. Rioux's tone of voice, his demeanor, and the context in which he made the inappropriate statement, it was clear that the statement was intended to convey sexual innuendo and was sexually harassing.

20.     Because of Mr. Rioux's sexually harassing comments and conduct, Ms. Morris started to wear looser clothing at work to draw less attention to herself, but Mr. Rioux continued to make sexually harassing comments and gestures to Ms. Morris.

21.     In or around this time, Ms. Morris raised protected concerns about the discrimination and sexual harassment to the Human Resources ("HR") Manager/Office Manager, Cathy Hayden ("Ms. Hayden").

22.     Ms. Hayden seemingly brushed aside Ms. Morris's concerns and instead dismissively told Ms. Morris that she (Ms. Hayden) had worked with men for a long time, and the male employees at the Company were just not used to working with women. Ms. Hayden did tell Ms. Morris that she would speak with Mr. Rioux.

23.     However, despite Ms. Hayden's indication, Mr. Rioux's sexual harassment continued and Mr. Rioux was not subjected to any meaningful discipline from the Company.

24.     Indeed, based on Ms. Hayden's lack of a meaningful response, her alarmingly dismissive comment, and the fact that the Company made no effort to protect Ms. Morris from further sexual harassment, it was clear that she was not taking Ms. Morris's concerns seriously.

25.     Indeed, the Company's utter lack of a meaningful response (and failure to remedy the discriminatory, sexually harassing, and otherwise harassing conduct) demonstrates the

continuous practice and policy of discrimination, and the severe and pervasive harassing and hostile work environment, that Ms. Morris was subjected to by the Company.

26.     Notably, Mr. Rioux referred to Ms. Morris as his "Robin Bobbin" and "Bobbin Robin" throughout her employment, in an inappropriate and sexually harassing manner. Notably, Mr. Rioux did not refer to the other male employees with sexually suggestive nicknames such as this.

27.     Ms. Morris made it clear that she did not want to be called by those names, but Mr. Rioux continued to refer to her by the nicknames.

28.     In or around mid-November 2019, the Company hired a new HR/Office Manager, Nicole Barticillo ("Ms. Barticillo").

29.     Upon information and belief, Ms. Barticillo is approximately 35 years old.

30.     Ms. Morris raised protected concerns to Ms. Barticillo about the sexual harassment that she was experiencing at work from the Machine Operator, the Assembler, and Mr. Rioux.

31.     Ms. Barticillo told Ms. Morris that the Company was going to have sexual harassment training in January 2020.  Notably, this training never occurred.

32.     In or around November or December 2019, Mr. Rioux told Ms. Morris that she was cold and asked her to cuddle with him.

33.     Ms. Morris adamantly protested the sexual harassment, made it clear that these comments made her very uncomfortable, and conveyed that she wanted the sexually harassing comments to stop.

34.     However, when Ms. Morris rejected Mr. Rioux's sexual advances, he became angry with her.  Thereafter, Mr. Rioux criticized Ms. Morris for minor mistakes and said, "I

don't know what it is with you, things weren't like this with Cathy" (referring to Ms. Hayden, who used to help Mr. Rioux with paperwork).

35.     It seemed clear that Mr. Rioux was upset that Ms. Morris did not engage in the *quid pro quo* flirtation that Ms. Hayden seemingly consented to and/or encouraged.

36.     Indeed, Ms. Morris increasingly observed a wider continuing pattern, practice, and seeming policy of sexually harassing culture at the Company.  Male managers routinely pursued sexual involvement with lower ranking female employees, and it appeared clear that Company management had established a sexually harassing culture in which there was a *quid pro quo* understanding wherein female employees who accepted or reciprocated the flirtation and sexual attention of male managers would be favored, whereas female employees who refused to accept or reciprocate the flirtation and sexual attention of male managers would be disfavored.

37.     Ms. Morris started to ask Ms. Barticillo to come with her when she had to go into Mr. Rioux's office because she was afraid to be alone with him.  Ms. Morris shared this information with Ms. Barticillo and she agreed to accompany Ms. Morris.  When Ms. Morris was with Ms. Barticillo, Mr. Rioux would not make the sexually harassing comments as frequently.

38.     In or around early 2020, Ms. Morris noticed that she was excluded from office gatherings by Ms. Francalangia and the younger employees when someone brought in bagels or donuts to share with the office.  For instance, Ms. Francalangia invited the younger employees to the front office to socialize and have a snack, but notably did not similarly invite Ms. Morris, the older employee.

39.     It seemed clear that Ms. Morris was being excluded on the basis of her age, due to the fact that she had raised protected concerns, and/or because she had opposed sexual harassment and/or refused to work in a sexually harassing work environment.

40.     Ms. Francalangia also began to routinely assign Ms. Morris noticeably more work than she assigned to similarly situated younger employees and would criticize Ms. Morris if she (Ms. Morris) asked for additional time to complete the large volume of assignments.

41.     Indeed, it appeared clear that Ms. Francalangia's criticism of Ms. Morris was motivated by discriminatory and/or retaliatory biases and was a further attempt to improperly harass Ms. Morris.

42.     Notably, Ms. Francalangia did not similarly criticize younger employees who raised concerns about their workload.

43.     In or around early 2020, Ms. Morris noticed that the Company still had not conducted sexual harassment training, despite Ms. Barticillo assuring Ms. Morris that the Company would promptly conduct the training.

44.     In or around January or February 2020, Mr. Rioux told Ms. Morris that he wanted to kiss her, but he could not because they were at work.  Notably, Ms. Barticillo was present when Mr. Rioux made these sexually harassing statements.

45.     Upon information and belief, Ms. Barticillo conveyed to Ms. Francalangia what Mr. Rioux had said to Ms. Morris.

46.     On or around March 2, 2020, Ms. Morris spoke with Ms. Hayden, the HR Manager, about the sexual harassment that she was still experiencing from Mr. Rioux (such as the blowing of kisses and requests to cuddle). Ms. Morris explained that Mr. Rioux's ongoing sexually harassing behavior was making her extremely uncomfortable in the workplace.

47.     Ms. Hayden told Ms. Morris that she would look into the matter.

48.     However, it was clear that Ms. Hayden's words were yet again an effort to dismiss Ms. Morris's very serious concerns. Indeed, Ms. Hayden failed to properly perform an adequate investigation and her words and actions over time were clear evidence that the ongoing discrimination, sexual harassment, harassment, and/or retaliation that Ms. Morris was subjected to were an ongoing practice and policy of discrimination that was both promoted and encouraged by the Company.

49.     In or around late February or early March 2020, a new employee, Juanita ("Juanita," last name unknown), was hired to assist with office work and accounts payables.

50.     On or around March 4, 2020, Juanita asked Ms. Morris a question about a task. Ms. Morris was in the middle of replying to her when Ms. Francalangia suddenly interrupted Ms. Morris and aggressively yelled at Ms. Morris, "If you don't know how to do that, I'm going to kick your ass!"

51.     Notably, Ms. Francalangia did not get short-fused with (let alone threaten physical violence against) the younger office employees, such as Juanita, Melissa ("Melissa," last name unknown), or Jasmine ("Jasmine," last name unknown). Indeed, upon information and belief, Juanita, Melissa, and Jasmine are all in their 30's.

52.     In response to Ms. Francalangia's clearly harassing comment that was motivated by discriminatory bias, Ms. Morris raised protected concerns and clearly conveyed through her body language and facial expressions that Ms. Francalangia's comment was inappropriate, unfair, and discriminatory in nature.

53.     In or around this time, Ms. Morris noticed that she was still being assigned more work than younger employees, despite the Company hiring Juanita to assist with accounts payable tasks.

54.     Approximately one week after Ms. Morris went to HR about Mr. Rioux's sexual harassment, Mr. Rioux told Ms. Morris that he knew someone had gone to HR about him and wanted to know who it was.  He threateningly told Ms. Morris that he suspected that it was Katie Vicky ("Ms. Vicky"), an office employee, but he stared closely and in a threatening manner at Ms. Morris while saying this in what seemed like an attempt to get Ms. Morris to confess that it was actually her who had gone to HR.

55.     Importantly, Ms. Vicky had told Ms. Morris in the past that Mr. Rioux asked for her home address and asked her out to lunch and dinner after he had her address, insinuating that he would pick her up and drop her off at home afterwards.

56.     Ms. Morris also learned from Ms. Vicky that Mr. Rioux had cornered her (Ms. Vicky) in the storage closet in early March 2020 and aggressively demanded that she kiss him.

57.     In or around this same time, Mr. Rioux asked Ms. Morris for her home address, clearly to ask Ms. Morris out to dinner, as he had with Ms. Vicky.  When Ms. Morris adamantly refused to give Mr. Rioux her address, he grew noticeably upset and angry with Ms. Morris.

58.     Around this same time, due to the ongoing sexual harassment, harassment, and/or discrimination that Ms. Morris was experiencing at work, Ms. Morris began experiencing symptoms of panic attacks, increased heart rate, trouble sleeping, reoccurring headaches, restlessness, and difficulty concentrating.

59.     On or around March 18, 2020, Ms. Morris sought treatment from her doctor due to these worsening symptoms.  Ms. Morris's doctor diagnosed her with generalized anxiety disorder.

60.     Ms. Morris's generalized anxiety disorder substantially limits one or more major life activities, including, but not limited to, Ms. Morris's sleeping, breathing, and her ability to socialize and be happy. Ms. Morris's generalized anxiety disorder also substantially impairs one or more major bodily function, including, but not limited to, Ms. Morris's neurological and/or brain functions.

61.     As such, Ms. Morris's generalized anxiety disorder is a disability under the ADA and under Connecticut law.

62.     Importantly, Ms. Morris could perform her essential job functions with or without reasonable accommodations and was thus a qualified employee under the ADA and similar state laws.

63.     Shortly after Ms. Morris's doctor appointment, Ms. Morris disclosed her anxiety disorder diagnosis to Ms. Barticillo.  In the context of this discussion, Ms. Morris also described her symptoms (including, but not limited to, the fact that she was experiencing panic attacks at work, headaches, sweating, and a racing heartbeat) and further explained that these symptoms were brought on, at least in part, due to the sexual harassment that Ms. Morris was experiencing at work and the work-related stresses from Ms. Francalangia (who was discriminatorily assigning Ms. Morris more work than she did the younger employees and critiquing Ms. Morris in a clearly discriminatory/retaliatory manner).

64.     Ms. Morris requested the reasonable accommodation of taking short breaks as necessary to recover from her panic attacks.

65.     Ms. Barticillo seemingly approved Ms. Morris's accommodation request.

66.     Thus, as of March 2020, the Company was aware of Ms. Morris's disability (generalized anxiety disorder) and the fact that she required a disability-related accommodation of short breaks due to her disability-related symptoms.

67.     In or around this same time, many employees, including Mr. Rioux, were allowed to work from home due to coronavirus pandemic concerns.

68.     Even though Mr. Rioux was not in the office, he continued to harass Ms. Morris by calling her repeatedly at work when he was home to discuss non-work-related matters.

69.     He also continued to refer to Ms. Morris as his "Robin Bobbin" when he called her, despite Ms. Morris's repeated requests that he not use this nickname to refer to her.

70.     On or around March 31, 2020, Ms. Morris's father passed away.  Ms. Morris told Ms. Barticillo and Ms. Francalangia about this.

71.     Ms. Morris told Ms. Barticillo that working would likely help with her anxiety disability (and distract her from the recent death of her father) but indicated that she (Ms. Morris) might need to utilize one or more disability-related accommodation(s) of taking time off of work in the near future for disability-related reasons if she experienced a flare up of her condition during this period of increased stress.

72.     Ms. Barticillo seemingly indicated that this request was approved.

73.     Upon information and belief, both Ms. Barticillo and Ms. Francalangia are non-disabled.

74.     In the week that followed, Ms. Morris began experiencing worsening panic attacks and other disability-related symptoms, likely due to the triggering event of her father's death.

75.     On or around April 6, 2020, Ms. Morris spoke with Ms. Francalangia and disclosed that she was experiencing worsened panic attacks due to her generalized anxiety disorder, the symptoms of which were seemingly exacerbated by the loss of her father.

76.     Ms. Morris reiterated her previous request for a disability-related accommodation of a short leave (around one week off of work) due to her worsened disability-related symptoms (including panic attacks).

77.     Ms. Francalangia abruptly informed Ms. Morris that she could not take the time off, and thus clearly denied Ms. Morris's disability-related request.

78.     Notably, at no point did Ms. Francalangia inform Ms. Morris that her request was an undue burden on the Company. Instead, without engaging in an interactive dialogue, Ms. Francalangia abruptly denied Ms. Morris's request without further discussion.

79.     Ms. Morris clearly conveyed protected concerns that this abrupt rejection with no dialogue was an improper denial of her requested disability-related accommodation.

80.     However, Ms. Francalangia then curtly declared that Ms. Morris was fired and added that Ms. Morris's termination was due to her (Ms. Morris's) anxiety and because Ms. Morris had requested time off of work.

81.     As such, Ms. Morris was involuntarily terminated on April 6, 2020.

82.     Indeed, based on the reason given for Ms. Morris's termination, it was unquestionable that she was fired because of her disability and because she had engaged in protected activity, including, but not limited to, requesting the disability-related accommodation of medical leave (as well as protesting the improper and overly abrupt denial of such leave).

83.     Importantly, Ms. Francalangia and the Company failed to engage in an interactive dialogue with Ms. Morris regarding her request for a disability-related reasonable

accommodation. Indeed, at no point did Ms. Francalangia attempt to discuss Ms. Morris's requested accommodation or to explore alternative accommodations. Rather, Ms. Morris was abruptly terminated instead.

84.     Had Ms. Francalangia attempted to engage in an interactive dialogue and/or asserted that Ms. Morris's request was an undue burden, Ms. Morris would have been open and willing to engage in a further dialogue, including to explore one or more alternative disability-related accommodations.

85.     Notably, the younger Juanita, who started after Ms. Morris (and therefore was less senior), had recently taken a week off from work for the death of her family member in the beginning of March 2020.  Ms. Francalangia and the Company allowed her the week off from work and an additional 2 weeks off for quarantining due to Juanita having travelled out of state.

86.     Upon information and belief, Juanita is non-disabled.

87.     Thus, it was clear that Ms. Morris's request for the disability-related reasonable accommodation of a one-week leave was not an undue burden on the Company.

88.     Upon information and belief, the Company replaced Ms. Morris with a non-disabled and/or younger employee.

89.     Furthermore, despite Ms. Morris repeatedly raising protected concerns, Ms. Morris was continuously subjected to ongoing instances of discrimination, sexual harassment, age and disability-related harassment, and/or retaliation that culminated in her termination. Based on the clear lack of adequate response from the Company, these unlawful behaviors were permitted by the Company to continue unremedied so to amount to a continuing discriminatory policy or practice.

90.     On October 23, 2020, Ms. Morris timely filed a Charge of Discrimination with the Connecticut Commission on Human Rights and Opportunities ("CHRO") (Charge No. 21101270), which was cross filed with the United States Equal Employment Opportunity Commission ("EEOC") (Charge No. 16A-2020-01616).

91.     The Company was named as Respondent in this charge.

92.     On or around January 7, 2021, Ms. Morris notified the CHRO of her intent to file a complaint in Federal District Court and/or Superior Court and, accordingly, requested that the CHRO release jurisdiction and permit Ms. Morris to file in Federal District Court and/or Superior Court.

93.     On or around February 16, 2021, the CHRO issued a release of jurisdiction to Ms. Morris.

94.     On or around February 18, 2021, the EEOC provided Ms. Morris with a Notice of a Right to Sue letter.

95.     This lawsuit is timely filed.

## COUNT I

### (Sexual Harassment and Sex Discrimination in Violation of Title VII, 42 U.S.C. §§2000e, *et. seq.*)

### Ms. Morris v. Defendant

96.     Ms. Morris incorporates all paragraphs above and below as if set forth fully herein.

97.     During all relevant times, the Company was an employer under Title VII, 42 U.S.C. §§2000e, *et. seq.* (hereinafter "Title VII") because it employed more than 15 persons for 20 or more calendar weeks within the previous 12-month period.

98.     The Company, by and through its agents (including, but not limited to, Mr. Rioux, Ms. Barticillo, Ms. Francalangia, and/or Ms. Hayden), sexually harassed, otherwise harassed, and discriminated against Ms. Morris with respect to her compensation, terms, and/or the conditions or privileges of her employment because of Ms. Morris's sex.

99.     Indeed, Ms. Morris was subjected to continuous related instances of discrimination, sexual harassment, harassment, and/or retaliation that culminated in her termination and these unlawful actions were permitted by the Company to continue unremedied for so long as to amount to an ongoing discriminatory policy or practice.

100.     More specifically, the Company subjected Ms. Morris to adverse actions, including, but not limited to, a hostile, harassing, and sexually harassing workplace, discriminatorily criticizing her and/or holding her to higher standards, discriminatorily assigning her with larger volumes of work than others, excluding her from work-related events, refusing to provide Ms. Morris with an adequate investigation into her protected concerns, and the termination of Ms. Morris's employment because she was a woman and/or because she was a woman who refused to accept, engage in, or reciprocate sexual harassment and/or refused to accept a sexually harassing and hostile work environment.

101.     The Company's improper actions included the creation and perpetuation of a *quid pro quo* sexually harassing workplace culture in which lower level female employees who accepted or reciprocated the flirtation, sexual attention, and harassing treatment of higher level male managers were favored and received more favorable treatment, compared to female employees who did not accept or reciprocate such inappropriate harassing conduct by male managers.

102.    As a direct and proximate result of the Company's violations of Title VII, Ms. Morris has suffered and continues to suffer damages, including, but not limited to, lost compensation and benefits, loss of earning capacity, other monetary harms, pain and suffering, loss of enjoyment of life, and emotional damages.

103.    The Company acted with malice and/or with reckless indifference to the federally protected rights of Ms. Morris.

104.    Ms. Morris seeks all damages to which she is entitled, including, but not limited to lost compensation and benefits (including, but not limited to, back pay and front pay), other monetary damages, diminished earning capacity, compensatory damages (including, but not limited to, future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses), punitive damages, interest, attorney's fees, and costs.

## COUNT II

**(Sexual Harassment and Sex Discrimination in Violation of Conn. Gen. Stat. § 46(a)-60))**

**Ms. Morris v. Defendant**

105.    Ms. Morris incorporates all paragraphs above and below as if set forth fully herein.

106.    The Company is an employer under the definitions applicable to Conn. Gen. Stat. § 46a-60 because the Company employed three or more persons.

107.    The Company, by and through its agents, including, but not limited to, Mr. Rioux, Ms. Barticillo, Ms. Francalangia, and/or Ms. Hayden, sexually harassed and discriminated against Ms. Morris with respect to her compensation, terms, conditions, and/or privileges of employment, because of Ms. Morris sex.

108.    Indeed, Ms. Morris was subjected to continuous related instances of discrimination, sexual harassment, harassment, and/or retaliation that culminated in her termination and these unlawful actions were permitted by the Company to continue unremedied for so long as to amount to an ongoing discriminatory policy or practice.

109.    Indeed, that upon information and belief, the Company failed to provide the sexual harassment training to their employees that is required under Conn. Gen. Stat. § 46a-60.

110.    More specifically, the Company subjected Ms. Morris to adverse actions, including, but not limited to, a hostile, harassing, and sexually harassing workplace, discriminatorily criticizing her and/or holding her to higher standards, discriminatorily assigning her with larger volumes of work than others, excluding her from work-related events, refusing to provide Ms. Morris with an adequate investigation into her protected concerns, and the termination of Ms. Morris's employment because she was a woman and/or because she was a woman who refused to accept, engage in, or reciprocate sexual harassment and/or refused to accept a sexually harassing and hostile work environment.

111.    The Company's improper actions included the creation and perpetuation of a *quid pro quo* sexually harassing workplace culture in which lower level female employees who accepted or reciprocated the flirtation, sexual attention, and harassing treatment of higher level male managers were favored and received more favorable treatment, compared to female employees who did not accept or reciprocate such inappropriate harassing conduct by male managers.

112.    The Company's actions were willful, wanton, reckless, and/or involved a conscious disregard of the rights of Ms. Morris and/or conduct so reckless to amount to such disregard.

113.    As a direct and proximate result of the Company's violations of Conn. Gen. Stat. § 46-60, the Plaintiff has suffered and continues to suffer damages, including, but not limited to, lost compensation and benefits, reduced earning capacity, other monetary harms, pain and suffering, loss of enjoyment of life, and emotional damages.

114.    Ms. Morris seeks all damages to which she is entitled, including, but not limited to lost compensation and benefits (including, but not limited to, back pay and front pay), other monetary damages, emotional distress damages, other compensatory damages (including, but not limited to, future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses), punitive damages, injury to reputation, diminished earning capacity, interest, attorney's fees, and costs.

## COUNT III

**(Disability Discrimination and Failure to Accommodate in Violation of the Americans with Disabilities Act, 42 U.S.C. §§12101, *et seq.*)**

**Ms. Morris v. Defendant**

115.    Ms. Morris incorporates all paragraphs above and below as if set forth fully herein.

116.    Ms. Morris suffers (and at all relevant times suffered) from generalized anxiety disorder.

117.    Ms. Morris's generalized anxiety disorder substantially limits one or more major life activities, including, but not limited to, Ms. Morris's sleeping, breathing, and her ability to socialize and be happy. Ms. Morris's generalized anxiety disorder also substantially impairs one or more major bodily function, including, but not limited to, Ms. Morris's neurological and/or brain functions.

118.    As such, Ms. Morris is (and at all relevant times was) disabled under the ADA.

119.    At all relevant times, Ms. Morris was a qualified employee and was capable of performing the essential functions of her job with or without one or more reasonable accommodations.

120.    Ms. Morris disclosed her disability to the Company and/or the Company was aware of Ms. Morris's disability and/or the Company regarded Ms. Morris as disabled.

121.    Ms. Morris requested disability-related reasonable accommodations that would have assisted her in performing the essential functions of her job.  These requested reasonable accommodations included, but were not limited to: (i) taking short breaks as necessary to recover from her panic attacks, (ii) taking time off from work related to a disability-related flare up, and/or (iii) taking a short leave of one week due to her disability-related symptoms.

122.    The Company failed to engage in an interactive dialogue related to some or all of Ms. Morris's reasonable accommodation requests.

123.    Ms. Morris's requested disability-related accommodations did not pose an undue burden on the Company.

124.    The Company improperly failed to provide Ms. Morris with one or more reasonable accommodations that she requested and that would have assisted her in performing the essential functions of her job.

125.    The Company also improperly failed to engage in an interactive dialogue with Ms. Morris regarding one or more of her reasonable accommodation requests.

126.    The Company discriminated against Ms. Morris due to her disability by subjecting Ms. Morris to adverse actions, including, but not limited to, a hostile, harassing, and sexually harassing workplace, discriminatorily criticizing her and/or holding her to higher standards than her non-disabled coworkers, discriminatorily assigning her with larger volumes of

work than her non-disabled coworkers, excluding her from work-related events, refusing to provide Ms. Morris with an adequate investigation into her protected concerns, and the termination of Ms. Morris's employment.

127.    Upon information and belief, the Company replaced Ms. Morris with a lesser or similarly qualified, non-disabled employee.

128.    The Company acted with malice and/or with reckless indifference to the federally protected rights of Ms. Morris.

129.    As a direct and proximate result of the Company's violation of the ADA, Ms. Morris has suffered and continues to suffer damages, including, but not limited to, lost compensation and benefits, loss of earning capacity, other monetary harms, pain and suffering, loss of enjoyment of life, and emotional damages.

130.    Ms. Morris seeks all damages to which she is entitled, including, but not limited to lost compensation and benefits (including, but not limited to, back pay and front pay), other monetary damages, diminished earning capacity, compensatory damages (including, but not limited to, future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses), punitive damages, interest, attorney's fees, and costs.

## COUNT IV

### (Disability Discrimination and Failure to Accommodate in Violation of
### Conn. Gen. Stat. § 46(a)-81)

### Ms. Morris v. Defendant

131.    Ms. Morris incorporates all paragraphs above and below as if set forth fully herein.

132.    Ms. Morris suffers (and at all relevant times suffered) from generalized anxiety disorder.

133.    Ms. Morris's generalized anxiety disorder substantially limits one or more major life activities, including, but not limited to, Ms. Morris's sleeping, breathing, and her ability to socialize and be happy. Ms. Morris's generalized anxiety disorder also substantially impairs one or more major bodily function, including, but not limited to, Ms. Morris's neurological and/or brain functions.

134.    As such, Ms. Morris is (and at all relevant times was) disabled under Conn. Gen. Stat. § 46(a)-81.

135.    At all relevant times, Ms. Morris was a qualified employee and was capable of performing the essential functions of her job with or without one or more reasonable accommodations.

136.    Ms. Morris disclosed her disability to the Company and/or the Company was aware of Ms. Morris's disability and/or the Company regarded Ms. Morris as disabled.

137.    Ms. Morris requested disability-related reasonable accommodations that would have assisted her in performing the essential functions of her job.  These requested reasonable accommodations included, but were not limited to: (i) taking short breaks as necessary to recover

from her panic attacks, (ii) taking time off from work related to a disability-related flare up, and/or (iii) taking a short leave of one week due to her disability-related symptoms.

138.    The Company failed to engage in an interactive dialogue related to some or all of Ms. Morris's reasonable accommodation requests.

139.    Ms. Morris's requested disability-related accommodations did not pose an undue burden on the Company.

140.    The Company improperly failed to provide Ms. Morris with one or more reasonable accommodations that she requested and that would have assisted her in performing the essential functions of her job.

141.    The Company also improperly failed to engage in an interactive dialogue with Ms. Morris regarding one or more of her reasonable accommodation requests.

142.    The Company discriminated against Ms. Morris due to her disability by subjecting Ms. Morris to adverse actions, including, but not limited to, a hostile, harassing, and sexually harassing workplace, discriminatorily criticizing her and/or holding her to higher standards than her non-disabled coworkers, discriminatorily assigning her with larger volumes of work than her non-disabled coworkers, excluding her from work-related events, refusing to provide Ms. Morris with an adequate investigation into her protected concerns, and the termination of Ms. Morris's employment.

143.    Upon information and belief, the Company replaced Ms. Morris with a lesser or similarly qualified, non-disabled employee.

144.    The Company's actions were willful, wanton, reckless, and/or involved a conscious disregard of the rights of Ms. Morris and/or conduct so reckless to amount to such disregard.

145.     As a direct and proximate result of the Company's violation of Conn. Gen. Stat. §

46(a)-81, Ms. Morris has suffered and continues to suffer damages, including, but not limited to,

lost compensation and benefits, loss of earning capacity, other monetary harms, pain and

suffering, loss of enjoyment of life, and emotional damages.

146.     Ms. Morris seeks all damages to which she is entitled, including, but not limited

to lost compensation and benefits (including, but not limited to, back pay and front pay), other

monetary damages, emotional distress damages, other compensatory damages (including, but not

limited to, future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish,

loss of enjoyment of life, and other nonpecuniary losses), punitive damages, injury to reputation,

diminished earning capacity, interest, attorney's fees, and costs.

## COUNT V

**(Age Discrimination in Violation of the ADEA, 29 U.S.C. §§ 621 *et seq.*)**

**Ms. Morris v. Defendant**

147.     Ms. Morris incorporates all paragraphs above and below as if set forth fully

herein.

148.     During all relevant times, the Company was an employer under the Age

Discrimination in Employment Act, 29 U.S.C. §§ 621, *et seq.* (hereinafter, "ADEA") because the

Company employed 20 or more individuals for 20 or more calendar weeks during the relevant

calendar years.

149.     At all relevant times, the Plaintiff was over 40 years old.

150.     The Company, by and through its agents, including, but not limited to, Mr. Rioux,

Ms. Barticillo, Ms. Francalangia, and/or Ms. Hayden, harassed and discriminated against Ms.

Morris with respect to her compensation, terms, conditions, and/or privileges of employment, because of Ms. Morris's age.

151.     More specifically, the Company subjected Ms. Morris to adverse actions including, but not limited to, a hostile, harassing, and sexually harassing workplace, discriminatorily criticizing her and/or holding her to higher standards than her younger coworkers, discriminatorily assigning her with larger volumes of work than her younger coworkers, excluding her from work-related events, refusing to provide Ms. Morris with an adequate investigation into her protected concerns, and the termination of Ms. Morris's employment because Ms. Morris was over 40 years old and/or because of Ms. Morris's age.

152.     The Company acted with malice and/or with reckless indifference to the federally protected rights of Ms. Morris.

153.     As a direct and proximate result of the Company's violations of the ADEA, the Plaintiff has suffered and continues to suffer damages, including, but not limited to, lost compensation and benefits, interest on lost compensation and benefits, reduced earning capacity, other monetary harms, pain and suffering, loss of enjoyment of life, and emotional damages.

154.     The Plaintiff seeks all damages to which she is entitled, including, but not limited to, lost compensation and benefits (including, but not limited to, back pay and front pay), diminished earning capacity, injury to reputation, other monetary damages, liquidated damages, attorneys' fees, interest, and costs.

## COUNT VI

### (Discrimination Based on Age in Violation of Conn. Gen. Stat. § 46a-60)

### Ms. Morris v. Defendant

155.    Ms. Morris incorporates all paragraphs above and below as if set forth fully herein.

156.    The Company, by and through its agents, including, but not limited to, Mr. Rioux, Ms. Barticillo, Ms. Francalangia, and/or Ms. Hayden, harassed and discriminated against Ms. Morris with respect to her compensation, terms, conditions, and/or privileges of employment, because of Ms. Morris's age.

157.    More specifically, the Company subjected Ms. Morris to adverse actions including, but not limited to, a hostile, harassing, and sexually harassing workplace, discriminatorily criticizing her and/or holding her to higher standards than her younger coworkers, discriminatorily assigning her with larger volumes of work than her younger coworkers, excluding her from work-related events, refusing to provide Ms. Morris with an adequate investigation into her protected concerns, and the termination of Ms. Morris's employment because Ms. Morris was over 40 years old and/or because of Ms. Morris's age.

158.    The Company's actions against Ms. Morris were willful and malicious.

159.    As a direct and proximate result of the Company's violations of Conn. Gen. Stat. § 46-60, the Ms. Morris has suffered and continues to suffer damages, including, but not limited to, lost compensation and benefits, other monetary damages, reduced earning capacity, pain and suffering, loss of enjoyment of life, and emotional damages.

160.    The Plaintiff seeks all damages to which she is entitled, including, but not limited to, lost compensation and benefits (including, but not limited to, back pay and front pay),

damages for diminished earning capacity and injury to reputation, other monetary damages, emotional distress damages, additional compensatory damages (including, but not limited to, future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses), punitive damages, attorneys' fees, interest, and costs.

## COUNT VII

### (Retaliation in Violation of Title VII, 42 U.S.C. §§ 2000e, *et seq.*)

### Ms. Morris v. Defendant

161.    Ms. Morris incorporates all paragraphs above and below as if set forth fully herein.

162.    Ms. Morris engaged in protected activity under Title VII, including, opposing, voicing protected concerns, and/or engaging in other protected activity related to concerns regarding the sexually harassing and discriminatory actions of Company employees, and/or requesting that the Company provide legally required sexual harassment training and/or raising protected concerns when the Company did not do so, and/or by voicing protected concerns regarding the Company's failure to investigate, and/or failure to take measures to appropriately address, and/or inappropriate response related to Ms. Morris's expression of concerns regarding the sexually harassing behavior of its employees.

163.    Ms. Morris further engaged in protected activity under Title VII, including, but not limited to, opposing, voicing protected concerns, and/or engaging in other protected activity related to concerns regarding discrimination based on Ms. Morris's sex.

164.    The Company retaliated against Ms. Morris for engaging in protected activity, including, but not limited to, the aforementioned protected activity, by subjecting Ms. Morris to

adverse actions including, but not limited to, a hostile, harassing, and sexually harassing workplace, discriminatorily criticizing her and/or holding her to higher standards, discriminatorily assigning her with larger volumes of work, excluding her from work-related events, refusing to provide Ms. Morris with an adequate investigation into her protected concerns, and the termination of Ms. Morris's employment.

165.    The Company unlawfully coerced, intimidated, threatened, and/or interfered with Ms. Morris's exercising of, or enjoyment of, one or more rights granted by Title VII.

166.    The Company acted with malice and/or with reckless indifference to the federally protected rights of Ms. Morris.

167.    As a direct and proximate result of the Company's violations of Title VII, Ms. Morris has suffered and continues to suffer damages, including, but not limited to, lost compensation and benefits, loss of earning capacity, other monetary harms, pain and suffering, loss of enjoyment of life, and emotional damages.

168.    Ms. Morris seeks all damages to which she is entitled, including, but not limited to lost compensation and benefits (including, but not limited to, back pay and front pay), other monetary damages, diminished earning capacity, compensatory damages (including, but not limited to, future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses), punitive damages, interest, attorney's fees, and costs.

**COUNT VIII**

**(Retaliation in Violation of Conn. Gen. Stat. § 46a-60)**

**Ms. Morris v. Defendant**

169.     Ms. Morris incorporates all paragraphs above and below as if set forth fully herein.

170.     Ms. Morris engaged in protected activity under Conn. Gen. Stat. § 46a-60, including, but not limited to, by voicing protected concerns she was being subjected to sexual harassment and that the Defendant refused to take action to allow her to work in a workplace free of sexual harassment in violation of Conn. Gen. Stat. § 46a-60.  Indeed, Ms. Morris also engaged in protected activity by requesting that the Company provide legally required sexual harassment training and/or raising protected concerns when the Company did not do so.

171.     Ms. Morris further engaged in protected activity under Conn. Gen. Stat. § 46a-60, including, but not limited to, by voicing protected concerns regarding the sexual harassment, otherwise harassing, and discriminatory actions improperly undertaken by the Company, and by Company employees and agents, including Mr. Rioux, Ms. Barticillo, Ms. Francalangia, and/or Ms. Hayden, based on Ms. Morris's sex, age, and/or regarding the creation of a hostile work environment through illegal harassment, sexual harassment, and discrimination.

172.     Ms. Morris further engaged in protected activity under Conn. Gen. Stat. § 46a-60, including, but not limited to, by (i) opposing, voicing protected concerns, and/or engaging in other protected activity related to the harassing and discriminatory actions taken by the Company due to Ms. Morris's disability; (ii) requesting reasonable accommodations for a disability which were intended to allow Ms. Morris to perform the essential functions of her job; and/or (iii) opposing, voicing protected concerns, and/or engaging in other protected activity related to the

failure of the Company to provide disability-related reasonable accommodations and/or the failure of the Company to engage in an interactive dialogue related to Ms. Morris's disability and requested accommodations.

173.    The disability-related accommodation requests which the Company retaliated against Ms. Morris for requesting included, but were not limited to, (i) taking short breaks as necessary to recover from her panic attacks, (ii) taking time off from work related to a disability-related flare up, and/or (iii) taking a short leave of one week due to her disability-related symptoms.

174.    The Company retaliated against Ms. Morris for engaging in protected activity, including, but not limited to, by subjecting her to a hostile, harassing, and sexually harassing workplace, discriminatorily criticizing her and/or holding her to higher standards than her non-disabled and/or younger coworkers, discriminatorily assigning her with larger volumes of work than her non-disabled and/or younger coworkers, excluding her from work-related events, refusing to provide Ms. Morris with an adequate investigation into her protected concerns, and the termination of Ms. Morris's employment.

175.    The Company's actions were willful, wanton, reckless, and/or involved a conscious disregard of the rights of Ms. Morris and/or conduct so reckless to amount to such disregard.

176.    As a direct and proximate result of the Company's violations of Conn. Gen. Stat. § 46-60, the Plaintiff has suffered and continues to suffer damages, including, but not limited to, lost compensation and benefits, reduced earning capacity, other monetary harms, pain and suffering, loss of enjoyment of life, and emotional damages.

177.    Ms. Morris seeks all damages to which she is entitled, including, but not limited to lost compensation and benefits (including, but not limited to, back pay and front pay), other monetary damages, emotional distress damages, other compensatory damages (including, but not limited to, future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses), punitive damages, injury to reputation, diminished earning capacity, interest, attorney's fees, and costs.

**COUNT IX**

**(Retaliation in Violation of the Americans with Disabilities Act, 42 U.S.C. §§12101,** *et seq.***)**

**Ms. Morris v. Defendant**

178.    Ms. Morris incorporates all paragraphs above and below as if set forth fully herein.

179.    Ms. Morris engaged in protected activity under the ADA, including, but not limited to: (i) opposing, voicing protected concerns, and/or engaging in other protected activity related to the harassing and discriminatory actions taken by the Company due to Ms. Morris's disability; (ii) requesting reasonable accommodations for disabilities which were intended to allow Ms. Morris to perform the essential functions of her job; and/or (iii) opposing, voicing protected concerns, and/or engaging in other protected activity related to the failure of the Company to provide disability-related reasonable accommodations and/or the failure of the Company to engage in an interactive dialogue related to Ms. Morris's disability and requested accommodations.

180.    The disability-related accommodation requests which Defendant retaliated against Ms. Morris for requesting included, but were not limited to, (i) taking short breaks as necessary

to recover from her panic attacks, (ii) taking time off from work related to a disability-related flare up, and/or (iii) taking a short leave of one week due to her disability-related symptoms.

181.     The Company unlawfully coerced, intimidated, threatened, and/or interfered with Ms. Morris's exercising of, or enjoyment of, one or more rights granted by the ADA.

182.     More specifically, the Company subjected Ms. Morris to adverse actions, including, but not limited to, a hostile, harassing, and sexually harassing workplace, discriminatorily criticizing her and/or holding her to higher standards than her non-disabled coworkers, discriminatorily assigning her with larger volumes of work than her non-disabled coworkers, excluding her from work-related events, refusing to provide Ms. Morris with an adequate investigation into her protected concerns, and the termination of Ms. Morris's employment.

183.     The Company acted with malice and/or reckless indifference to the federally protected rights of Ms. Morris.

184.     As a direct and proximate result of the Company's violation of the ADA, Ms. Morris has suffered and continues to suffer damages, including, but not limited to, lost compensation and benefits, loss of earning capacity, other monetary harms, pain and suffering, loss of enjoyment of life, and emotional damages.

185.     Ms. Morris seeks all damages to which she is entitled, including, but not limited to lost compensation and benefits (including, but not limited to, back pay and front pay), other monetary damages, diminished earning capacity, compensatory damages (including, but not limited to, future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses), punitive damages, interest, attorney's fees, and costs.

## COUNT X

### (Retaliation in Violation of the ADEA, 29 U.S.C. §§ 621 *et seq*.)

### Ms. Morris v. Defendant

186.     Ms. Morris incorporates all paragraphs above and below as if set forth fully herein.

187.     Ms. Morris engaged in protected activity under the ADEA, including, but not limited to: (i) opposing, voicing protected concerns, and/or engaging in other protected activity related to the harassing and discriminatory actions taken by the Company due to Ms. Morris's age.

188.     The Company discriminated against and/or retaliated against Ms. Morris for opposing, voicing protected concerns, and/or engaging in other protected activity related to one or more practices made unlawful by the ADEA by subjecting Ms. Morris to adverse actions, including, but not limited to, a hostile, harassing, and sexually harassing workplace, discriminatorily criticizing her and/or holding her to higher standards than her younger coworkers, discriminatorily assigning her with larger volumes of work than her younger coworkers, excluding her from work-related events, refusing to provide Ms. Morris with an adequate investigation into her protected concerns, and the termination of Ms. Morris's employment.

189.     The Company unlawfully coerced, intimidated, threatened, and/or interfered with Mr. Morris's exercising of, or enjoyment of, one or more rights granted by the ADEA.

190.     The Company acted with malice and/or with reckless indifference to the federally protected rights of Ms. Morris.

191.    As a direct and proximate result of the Company's violations of the ADEA, Ms.

Morris has suffered and continues to suffer damages, including, but not limited to, lost

compensation and benefits, interest on lost compensation and benefits, reduced earning capacity,

other monetary harms, pain and suffering, loss of enjoyment of life, and emotional damages.

192.    Ms. Morris seeks all damages to which she is entitled, including, but not limited

to, lost compensation and benefits (including, but not limited to, back pay and front pay),

diminished earning capacity, injury to reputation, other monetary damages, liquidated damages,

attorneys' fees, interest, and costs.


WHEREFORE, the plaintiff, Robin Morris, respectfully requests that this honorable

court:

A.  Schedule this matter for trial by jury;

B.  Find the Defendant liable on all counts;

C.  Award the Plaintiff her lost compensation and benefits (including, but not limited

to, back pay and front pay;

D.  Award the Plaintiff other monetary damages, including damages for her

diminished earning capacity and injury to reputation;

E.  Award the Plaintiff emotional distress damages;

F.  Award the Plaintiff compensatory damages, including, but not limited to, future

pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss

of enjoyment of life, and other nonpecuniary losses;

G.  Award the Plaintiff punitive damages;

H.  Award the Plaintiff liquidated (i.e., double) damages;

I.   Award the Plaintiff her reasonable attorney's fees;

J.   Award the Plaintiff interest and costs;

K.   Award the Plaintiff all other damages to which she is entitled; and

L.   Grant such further relief as is just and equitable.


Respectfully Submitted,

ROBIN MORRIS

By her attorneys,

THE LAW OFFICES OF WYATT
& ASSOCIATES P.L.L.C

Date: 3/12/21                    By:

Benjamin J. Wyatt, Bar No ct29994
BWyatt@Wyattlegalservices.com

Timothy J. Brock, Bar No. ct30864
TBrock@Wyattlegalservices.com

Katherine A. Gabriel, Bar No. ct30948
Katherine@Wyattlegalservices.com

The Law Offices of Wyatt & Associates,
P.L.L.C.
17 Elm Street, Suite C211
Keene, NH 03431
Telephone: (603) 357-1111
Facsimile: (603) 685-2868